UNITED STATES DISTRICT COURT

MIDDLE DISTRICT LOUISIANA

ORNISE SCOTT, ET AL[1]

VERSUS

J.E. MERIT CONSTRUCTORS, INC.

CIVIL ACTION

No. 06-915-BAJ-SCR

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on sixteen Motions for Summary Judgment (docs. 66-81) filed by defendant, J.E. Merit Constructors, Inc. ("Jacobs"). Plaintiffs Robert Cosey, Glenda Dorsey, Harry Dunn, Allen Edwards, Thomas Gordon, Kermit Harris, Bertha Hollins, Walter Jackson, Adam Johnson, Patrick Morris, H.B. Rucker, Gerald Taylor, Ornise Scott, and Ernest Ventress, Jr., have filed oppositions (doc. 85). Jurisdiction is based upon 28 U.S.C. §§1331 and 1367.

## FACTUAL BACKGROUND

The complaint in this matter was filed on December 1, 2006, by fourteen current and former employees of Jacobs. Plaintiffs allege that they worked for defendant as pipefitters, boilermakers, and maintenance workers at the Dow Chemical plant in Plaquemine, Louisiana. Plaintiffs assert that defendant administered and used the results of the National Center for Construction Education

---

[1]The record shows that the plaintiff referenced in the caption as "Ornise Scott" is improperly named. The plaintiff's name is actually "Ormise Scott." *See, e.g.,* Deposition of Ormise Scott (doc. 66, Ex. 28, pp. 30-34).

1

and Research ("NCCER") assessment test in a discriminatory fashion to reassign and classify black employees so that they received lower pay and were more vulnerable to layoffs than other similarly situated employees. Plaintiffs also allege that defendant racially discriminated against them in hiring for permanent positions and by hiring less experienced white employees to supervisory positions, replacing black supervisors with white employees who had less experience, and by allowing white employees to work overtime that was denied to black employees. According to the plaintiffs, the defendant also created and tolerated a hostile working environment for black employees.

The fourteen plaintiffs assert the following claims: (1) Race discrimination in violation of the Louisiana Employment Discrimination Law, LSA–R.S. 23:301, et seq. ("LEDL"); (2) race discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. 2000e, et seq. ("Title VII"); (3) race discrimination in violation of 42 U.S.C. §1981 ("§1981"); (4) violations of the Louisiana Whistleblower Statute, LSA–R.S. 23:967; and (5) violations of the Louisiana Human Rights Act, LSA–R.S. 51:2256.

On March 9, 2007, defendant filed a motion to dismiss all claims of race discrimination brought pursuant to the LEDL, all claims of race discrimination brought pursuant to Title VII (excluding those of plaintiff, Walter Jackson), and all claims of race discrimination brought pursuant to 42 U.S.C. §1981 (doc. 12). On June 5, 2007, this Court granted defendant's motion in part, and dismissed all claims brought pursuant to the LEDL, all claims brought pursuant to Title VII except for the

2

Title VII claims asserted by Walter Jackson, and all claims brought pursuant to §1981 upon a theory of adverse impact (doc. 22).

Plaintiffs' remaining claims are grounded in the Louisiana Human Rights Act, LSA–R.S. §51:2256; the Louisiana Whistleblower Statute, LSA–R.S §23:967; and 42 U.S.C. §1981. In addition to claims asserted under the foregoing statutes, plaintiff, Walter Jackson, asserts a claim under Title VII.

## LAW AND DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In determining whether the movant is entitled to summary judgment, the court views facts in the light most favorable to the non-movant and draws all reasonable inferences in movant's favor. *Coleman v. Houston Independent School District*, 113, F.3d 528 (5th Cir. 1997). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2411, 91 L.Ed.2d 202 (1986). The non-movant's burden, however, is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations, unsubstantiated assertions or a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment is appropriate if the non-movant

3

"fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. V. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In support of the motions for summary judgment, defendant asserts that plaintiff's complaint sets forth rather vague factual allegations. After defendant addressed – in sixteen separate memoranda – various claims that plaintiffs may or may not have alleged,[2] plaintiffs' opposition addressed, in a single memorandum, only the following claims:

> (1) Race discrimination based on the NCCER testing, and subsequent demotion, of Ernest Ventress, HB Rucker, Harry Dunn, Walter Jackson, Glenda Dorsey, Thomas Gordon and Gerald Taylor;

---

[2] *See, e.g.*, Defendant's Memorandum in Support of Motion for Summary Judgment Re: Plaintiffs' La. R.S. 51:2256, La. R.S. 23:967, and Pattern and Practice Discrimination Claims (doc. 67-1, pp. 7-9) (addressing plaintiffs' "pattern and practice claims"); Defendant's Memorandum in Support of Motion for Summary Judgment as to the Claims of plaintiff Ernest Ventress (doc. 68-1) (noting that Ventress appears to assert a retaliation claim and a claim of disparate treatment based on a suspension that he received for a safety violation in December 2001); Defendant's Memorandum in Support of Motion for Summary Judgment as to the Claims of plaintiff H.B. Rucker (doc. 69-1) (assuming that Rucker alleges a retaliation claim); Defendant's Memorandum in Support of Motion for Summary Judgment as to the Claims of plaintiff Robert Cosey (doc. 70-1) (assuming that Cosey alleges a retaliation claim); Defendant's Memorandum in Support of Motion for Summary Judgment as to the Claims of plaintiff Harry L. Dunn (doc. 71-1) (assuming that Dunn alleges a retaliation claim and a claim of discrimination based on his reassignment to lift lines for painters).

The Court also notes the lack of specific, relevant information provided by plaintiffs, such as the failure of counsel to identify which positions they were denied, or to correctly identify those whom the plaintiffs claim filled the positions to which they were entitled. Accordingly, defendant was called upon to speculate as to plaintiffs' claims, the names of those persons who were allegedly hired instead of the plaintiffs, and, essentially, to make a case against itself. Although the Court has tried to interpret plaintiffs' claims as much as is reasonably possible, neither the defendant nor the Court has a duty to make a case for the plaintiffs. In the absence of evidentiary support for their claims, the Court refuses to assume that the plaintiffs could or would prove the necessary facts of their case.

4

(2) Race discrimination based on the denial of promotional opportunities to Ernest Ventress, HB Rucker, Harry Dunn, Allen Edwards, Glenda Dorsey, Thomas Gordon, Gerald Taylor, Kermit Harris, Patrick Morris, Ormise Scott and Adam Johnson;

(3) Race discrimination based on the transfer and termination of Robert Cosey;

(4) Race discrimination based on the denial of overtime opportunities to plaintiff Adam Johnson;

(5) Retaliation against Bertha Hollins and Glenda Dorsey and Ormise Scott for engaging in protected activity.

(Doc. 85, pp. 2-11). Moreover, plaintiffs "concede that their remaining claims are limited to claims asserted pursuant to 42 [U.S.C. §] 1981. . . as to all plaintiffs and Title VII as to plaintiff, Walter Jackson, only" (doc. 85, p. 2).

Accordingly, all claims asserted pursuant to the Louisiana Human Rights Act and Louisiana Whistleblower Statute shall be dismissed. See. e.g., *Hospitality House, Inc. v. Gilbert,* 298 F.3d 424, 434 n. 12 (5th Cir. 2002) (holding that plaintiffs' § 1983 claim was abandoned where plaintiffs made clear representations to the district court that they were not alleging any violations of federal rights); *Mitchell v. Snow,* 326 Fed. Appx. 852, 854 n. 2 (5th Cir.2009) (holding that plaintiff's claims were waived where she withdrew them in her response to the defendant's motion for summary judgment); *Watkins v. Paulsen,* 332 Fed. Appx. 958, 959 n.2 (5th Cir.2009) (same).

Case 3:06-cv-00915-BAJ-SCR   Document 149   05/15/12   Page 5 of 47

# I. Demotion Claims

Plaintiffs, Ventress, Rucker, Dunn, Jackson, Dorsey, Gordon, and Taylor, allege that Jacobs' implementation of the NCCER exam discriminated against them on the basis of race, as they were all previously classified as Class A Mechanics but were demoted to Class B Mechanics after failing the NCCER exam.[3] In support of this contention, plaintiffs point to the fact that supervisors, emergency hires for "turnarounds," and welders were exempted from taking the NCCER exam.[4]

Defendant argues that (1) the NCCER was implemented in response to Dow Chemical's concerns that it was paying A-Class wage rates for workers who did not possess A-Class skills; (2) welders were not required to take the NCCER test because welders were required to pass an off-site welding test; (3) it is impracticable

---

[3] The NCCER exam was implemented in phases. Pipefitters, boilermakers, and millwrights were required to take the exam. Pipefitters were tested first, boilermakers were tested second, and millrights were tested last. After approximately forty-percent of the workforce failed, Jacobs provided training classes to employees of each craft. The classes were held in the evening, two nights each week. Training was provided to the workers at no cost, employees could take the test at no cost, and those employees who failed the test were permitted to take the test as many times as they chose. Dow allowed Jacobs approximately twelve months to get its pipefitters, boilermakers, and millwrights tested. After the twelve-month testing period expired, those A-Class employees who had not achieved a passing score on the NCCER exam were reclassified from A-Class mechanics to B-Class mechanics. *See* Declaration of Kenny Clark, (doc. 66-34, p. 3-4, ¶ 11-16); Deposition of Kenneth Hill (doc. 66-6, p. 29).

[4] A turnaround is a scheduled maintenance event in which an entire process unit of the plant is taken offline for an extended period for revamping and renewing. Dow relies on Jacobs to support turnarounds when requested to do so and the number of employees Jacobs is required to provide varies from turnaround to turnaround. At the beginning of a turnaround, Jacobs hires additional workers with the understanding that they will be laid off at the conclusion of the turnaround. *See* Declaration of Jeff Cooley (doc. 66-33, p. 5, ¶ 16); Deposition of Robert Cosey (doc. 66-21), pp. 13-14; Declaration of Kenny Clark (66-34, pp. 2-3, ¶8).

Case 3:06-cv-00915-BAJ-SCR   Document 149   05/15/12   Page 6 of 47

to test turnaround craftsmen given the short-term, emergency nature of the projects and the amount of time required to study for and pass the NCCER; (4) any employee who is hired during a turnaround must take the NCCER within 45 days of the close of the turnaround in order to remain employed by Jacobs in an A-Class capacity; and (5) both black and white A-Class employees failed the NCCER and were reclassified to B-Class employees in accordance with the new Dow contract.

"The elements of . . . claims under Title VII and 42 U.S.C. § 1981 are identical."[5] *Pratt v. City of Houston*, 247 F.3d 601, 606 n. 1 (5th Cir.2001). The basic structure of a § 1981 claim requires a plaintiff alleging race discrimination to make an initial *prima facie* showing that: "(1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership [in] the protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Brooks v. Lubbock Cty. Hosp. Dist.*, 373 Fed. Appx. 434, 436-37, 2010 WL 1439109, *2-3 (5th Cir.), *cert. denied*, --- U.S. ----, 131 S.Ct. 228, 178 L.Ed.2d 151 (2010)(citing, *Lee v. Kansas City Southern Railway Co.*, 574 F.3d 253, 259 (5th Cir.2009)). After the plaintiff has made his showing, the burden of production shifts to the defendant to rebut the *prima facie* case by setting forth one or more legitimate,

---

[5]Accordingly, the Title VII claims asserted by plaintiff, Jackson, are herein analyzed concurrently with his § 1981 claims.

7

race-neutral explanations for the challenged employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). This burden of production does not involve a credibility assessment by the court. *Id*. at 509, 113 S.Ct. 2742. If the defendant can provide nondiscriminatory reasons for the action, the presumptions and burdens of the *McDonnell Douglas* framework disappear and the focus turns to the question of "discrimination vel non." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (quotation marks omitted). In order to satisfy this burden, the plaintiff must prove either: "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected [activity or characteristic] (mixed-motive[s] alternative)." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir.2004) (third alteration in original); see also, *Smith v. Xerox Corp.*, 602 F.3d 320, 326 (5th Cir.2010). "When determining the question of pretext, the court may consider 'the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Prejean v. Radiology*

8

*Assocs. of Sw. La., Inc.*, 342 F. App'x 946, 950 (5th Cir.2009) (quoting, *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir.2002); *Reeves*, 530 U.S. at 148-49, 120 S.Ct. 2097). Under the mixed-motive theory, if the plaintiff shows that the plaintiff's protected characteristic was a motivating factor, then the burden shifts to the employer to show that the adverse employment decision would have been made regardless of the discriminatory animus. See, *Rachid*, 376 F.3d at 312. If "no rational factfinder could conclude that the action was discriminatory," summary judgment for the employer is appropriate. *Price*, 283 F.3d at 720 (citations omitted).

Defendant alleges that plaintiffs have failed to prove the second, third, and fourth prongs of their *prima facie* case. The Court finds that, even assuming that the plaintiffs could establish the second and third prongs of their *prima facie* case, they have failed to meet their burden of proof on the forth prong.

Under the forth prong, "[t]o establish disparate treatment, a plaintiff must demonstrate that a 'similarly situated' employee under 'nearly identical' circumstances, was treated differently." *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir.2005) (citing, *Mayberrv v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir.1995)). This standard is strictly construed. *Okoye v. Univ. of Tex. Houston Heath Sci. Ctr.*, 245 F.3d 507, 514-15 (5th Cir.2001). The Fifth Circuit has consistently found that employees with different responsibilities, different supervisors, different capabilities, different work rule violations, or different

9

disciplinary records are not considered "nearly identical." See, e.g., *Lee*, 574 F.3d at 259-260.

In opposition to the motions, plaintiffs assert that Kenny Clark, Clint Russell, Todd Landry (white employees of Jacobs), and craftsmen hired for turnaround projects were not required to take the NCCER exam (doc. 85, pp. 3, 6). Plaintiffs, however, offer no explanation as to why they believe these individuals are similarly situated to themselves, and the evidence does not support such a finding. To the contrary, uncontroverted evidence establishes for purposes of the motions that Clark and Russell were not employed as craft mechanics when the NCCER was implemented. Clark was an Area Supervisor[6] and Russell was a Planner.[7] Craft work was not performed in either of these positions, the required skill sets are entirely different, and the supervisors involved were different than those involved in the craft mechanic positions.[8] Todd Landry was employed as a welder, but welders

---

[6] See, Declaration of Jeff Cooley (doc. 66-33, p. 3, ¶ 7.)

[7] See, Declaration of Kenny Clark (doc. 66-34, p. 10; ¶ 48); Declaration of Darryl Fuentes (doc. 82, p. 8, ¶ 28).

[8] Planners are responsible for reviewing a job and detailing how the job will be performed as well as estimating the time and material necessary to complete the job. In other words, the Planner is required to prepare a package that contains all of the necessary information about a job, including the labor and material required to complete the job efficiently and safely. See, Declaration of Jeff Cooley (doc. 66-33, pp. 6-7, ¶ 22-27, and p. 31, Ex. 31-D).

An Area Supervisor is assigned to each "Area." The Areas include Plastic Central Maintenance ("PCM"); Chemicals & Intermediates Maintenance ("CIM"); Oxides Specialty Maintenance ("OSM"); Hydrocarbons, Energy & Brine Maintenance ("HEBM"), and Maintenance Technical Services ("the Machine Shop"). Each of these Areas is further subdivided into "Blocks." Each Area Supervisor selects Team Leaders and Back-up Team Leaders to supervise each "Block" within an Area. Area Supervisors are also responsible for

10

were not required to take the NCCER exam because the exam does not test

welders.[9] Instead, welders were required to take and pass a welding certification

test in an off-site welding lab.[10] The Court also notes that turnaround employees are

not similarly situated to plaintiffs because the turnaround positions are, by nature,

short-term. Moreover, the uncontroverted evidence establishes that, although the

NCCER requirement is temporarily lifted to meet increased demands created by the

turnaround, once the turnaround is over the NCCER requirement is reinstated and

any employee who was hired during the turnaround must take the NCCER within 45

---

transferring employees to and from Blocks and making decisions regarding the hiring, firing, and job advancement of craft mechanics. *See,* Declaration of Jeff Cooley (66-33, pp. 2-3, ¶ 6-7); Deposition of Kermit Harris (doc. 66-28, p. 61); Declaration of Kenny Hill (doc. 66-36, p. 5-6, ¶ 18-20, 22, 23, 24, 28).

The plaintiffs complaining of the use of the NCCER were, at best, A-Class craft mechanics at the time the NCCER was implemented. Unlike Planners or Area Supervisors, A-Class craft mechanics made no decisions regarding the transfer, hiring, firing, and job advancement of other mechanics, nor were they responsible for estimating the time and material necessary to complete the job. Instead, the craft mechanic positions were highly hands-on positions which required the workers to perform particular tasks relating to their specified craft. Among the tasks and abilities required of pipefitters and boilermakers were to read and understand drawings and piping specifications; to layout, fabricate, inspect, assemble, maintain, and repair pipe and piping system components; to have a knowledge of tools, valves, gaskets, rigging, boilers, furnaces, drums, reactors, trays, exchangers, tube repair and packed towers; and to assemble structural metal components such as supports, hangers, and spring cans. *See,* Declaration of Jeff Cooley (doc. 66-33, pp. 6-7, ¶ 23-27, and Exs. 31-A, 31-B, & 31-D).

[9] Declaration of James Watts (doc. 66-35, p. 3, ¶ 10).

[10] Deposition of Jeff Cooley (doc. 66-3, pp. 49); Deposition of Kenneth Clark (doc. 66-4, pp. 111-113, 148-149); Declaration of Kenneth Clark (doc. 66-34, p. 4, ¶14); Declaration of James Watts (doc. 66-35, p. 3, ¶ 10).

11

days of the close of the turnaround in order to remain employed by Jacobs in an A-Class capacity.[11]

Even if plaintiffs had met their burden of setting forth a *prima facie* case of disparate treatment based on NCCER testing, defendant has articulated legitimate, race-neutral explanations for exempting welders, turnaround employees, and non-craft positions from the NCCER. Therefore, the presumptions and burdens of the *McDonnell Douglas* framework would disappear, and the focus would turn to the question of "discrimination vel non." See, *Reeves*, 530 U.S. 133, 142-43. Thus, plaintiffs would bear "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against" them. *Id.* at 143 (quotation marks omitted).

Plaintiffs, however, have offered no evidence to establish a genuine dispute of fact as to whether race played any factor in Jacob's decision to demote those who failed the NCCER exam, and the undisputed evidence reflects that white employees were also required to take the test, and that they were reclassified from A-Class Mechanics to B-Class Mechanics with a corresponding reduction in wages if they failed it.[12] Moreover, the undisputed evidence establishes that all employees were

---

[11] Deposition of Darryl Fuentes (doc. 113, pp. 39-40); Deposition of Jeff Cooley (doc. 66-3, pp. 89-90); Deposition of Kenny Clark (doc. 66-4, p. 75); Deposition of Roy Ridgel (doc. 66-10, p. 14).

[12] Deposition of Thomas James Gordon (doc. 66-24, p. 24-25); Deposition of Harry Dunn (doc. 66-23, p. 37); Declaration of Kenny Clark (doc. 66-34, pp. 4-5, ¶ 16-20); Declaration of James Watts (doc. 66-35, p. 5, ¶ 19).

given an equal opportunity to study for the NCCER exam,[13] training was provided to all workers at no cost, workers could take the test at no cost, and all employees who failed the test were permitted to retake the test as many times as they chose.[14]

The Court also notes that several plaintiffs made deposition statements indicating that, though they were personally dissatisfied with defendant's decision to implement the NCCER test, they were unaware of any specific racial component in its implementation.

For example, during the deposition of defendant, H.B. Rucker, the following exchange occurred.

> Q.   Tell me about that conversation with Kenny Hill.
> A.   Well, I explained to him that, you know, I felt that the test wasn't fair, especially for craftsmen that had been doing the type of work for 18, 19 years and you take a test and determine how to pay a man, and I've been making A class money all that time, 18, 19 years, and then all of a sudden you give me a test and tell me that I'm not certified but, yet, you still want me to do A class work.
>        Then a lot of times they had jobs that had to be done. I had to stop doing what I had to do and go do a specific job because the guy that took the test and passed it couldn't do it.
>                          * * * * *
> Q.   Do you think that the craft test was motivated by race in any way?
> A.   Do I think the craft test was what?

---

[13] Deposition of Glenda Dorsey (doc. 66-22, p. 53); Deposition of Walter Jackson, Sr. (Doc. 66-27, p. 56); Deposition of Allen Edwards (doc. 66-26, p. 39).

[14] Declaration of Kenny Clark (doc. 66-34, ¶¶ 11-16); Deposition of Kenneth Hill (doc. 66-6, p. 29).

> Q.	There was anything about the craft test that was racial in any way?
> A.	I wouldn't think so.

(Doc. 66-20, pp. 40-41, 50).

The following exchange is from the deposition of Robert Cosey:

> Q.	If you didn't pass the test, regardless of your skin color, you're going to have your pay reduced; is that right?
> A.	Yes, ma'am.
> Q.	So do you think that race played any role in you having to take the test or potentially having your salary reduced?
> A.	No, ma'am. Because everybody had to take the test. But that wasn't the issue.
> Q.	What was the issue?
> A.	The issue was I had no problem in taking a pay cut. I just wanted another fair chance to take the test...

(Doc. 66-21, p. 41).

Harry Dunn's deposition reveals the following exchange:

> Q.	Do you think the implementation of the craft test had anything to do with your race?
> A.	I think I was -- I think so.
> Q.	Why do you say that?
> A.	Because all the years I was with them, I started off A class. And then all of a sudden, they give me a test after I have been doing this for years. You know, that's part of my reason.
> Q.	Okay.
> A.	And I always done my job correctly. I never had a complaint about my work.
> Q.	And so why do you think that had something to do with your race?
> A.	Well, I don't know because they just kept on about the test and about, you know - -
> Q.	Anything else?

14

A.    No.

(Doc. 66-23, pp. 49-50).

The following excerpt is from the deposition of Earnest Ventress, Jr.:

Q.    What did he tell you was the purpose of the skilled assessment test?
A.    To see what the craftsmen -- see, Dow said that they were getting too many people out there that wasn't qualified to do the work, which they was, coming out there. Some of 'em come out there, friends they got, they'd bring 'em out there. They never worked in a plant in their life. But they'd come out and get A Class money, and that's what was happening. The people who come out and do all that work, they're putting stuff together wrong in the wrong places, and that's where they come from.
Q.    Okay. So that was the reason for the test?
A.    That was the reason why. But if you're out there working for the last 15 years out there, 20 years working on pipe, you shouldn't have to go through that. Out of all the time that I was at that plant, I never done anything wrong as far as pipes putting them together.

(Doc. 66-19, p. 39).

This exchange is from the deposition of Gerald Taylor:

Q.    Is there anything about the test itself or the taking of the test that you believe had to do with your race?
A.    Well, before that, there was no test. All of a sudden the test come up. A man is evaluated on the job, what he does. If you look at a test, what does it prove? I know people who have taken the test now can't even do the work. You see what I'm saying? And then the ones that pass it, they have to go, what, 60 days or something like that? If you already done passed the test, you ought to know what you

15

doing. That's the way I look at it. But there are some
people who passed the test can't even do the job.

(Doc. 66-25, pp. 70-71).

The following excerpt comes from the deposition of Allen Edwards:

> Q. Now, are you aware of any white employees that
> didn't pass the test?
>
> A. Am I aware of any white employees who didn't pass
> the test? They had a couple of guys that didn't pass
> the first time. They went back, and they took it, and
> they passed it the second time. Am I aware of any
> white employees who didn't take it, didn't pass it?
> I'm trying to think. I don't, I can't even really recall.
>
> Q. And with respect to the test and either the training
> for the test or the taking of the test -- were white
> employees treated more favorably than black
> employees in any respect?
>
> A. No, ma'am. Because everybody who took the test
> was equal of your knowledge, of what you know,
> equal with what you know. The test really -- to me,
> it really don't determine if you're a A class or a B
> class pipefitter because they got guys who been out
> there years, and they know -- they know the work.
> They knew that plant like the back of their hand.
> They can do the work. But it's just a test that
> determines their fate of what they get paid, and
> everybody had to take it.

(Doc. 66-26, pp. 39-40).

The following is from the deposition of Kermit Harris:

> Q. Do you think that there was anything about the
> NCCER test that was racially motivated?
>
> A. I think the NCCER test, the material that they gave
> us the first time, it wasn't on the test. It was all the
> way different. Meaning, if you are a pipe fitter,
> meaning, that you're going to have to know how to
> work the bluebook to pass the test. Because when

16

> you take the test, they gave you a calculator, a basic calculator, a bluebook, and a pencil. And if you're not trained or been around, you are not going to pass that test. I mean, that's just the way it is. So if you haven't been to school or know how to work or know about trigonometry looking in the book, right triangle, what pi means, you're not going to pass that test.

(Doc. 66-21, pp. 37-38).

In analyzing issues like this one, the Court "must be careful not to allow Title VII [and § 1981] plaintiffs simply to litigate whether they are, in fact, good employees." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir.2002). The question to be resolved is not the wisdom or accuracy of Dow or Jacobs' decision to implement the NCCER, or whether it was "prudent or fair" to decrease plaintiffs' salaries after they failed the exam. Instead, the Court's "sole concern is whether unlawful discriminatory animus motivate[d]" the decision. *Rojas*, 285 F.3d at 1342. Because "no rational factfinder could conclude that the action was discriminatory," summary judgment for the defendant is appropriate on all claims based upon Jacobs' use of the NCCER exam to demote plaintiffs. See, e.g., *Price*, 283 F.3d at 720 (citations omitted).[15]

---

[15]The Court notes that the memorandum in opposition to the motions for summary judgment does not even mention plaintiff, Jackson, except to state the claims he asserts and to specifically note that, along with others, he alleged that the NCCER exam discriminated against him on the basis of race and to note that he received his Chapter 7 discharge in April of 2005 (doc. 85, pp. 2, 24). Thus, in addition to failing to set forth evidence that others outside his class were treated differently, Jackson has failed to set forth evidence to show that defendant's articulated reasons for its actions were pretextual.

17

## II. Failure to Promote Claims

Ventress, Rucker, Dunn, Edwards, Dorsey, Gordon, Taylor, Harris, Morris, Scott and Johnson allege that they were denied promotional opportunities on the basis of race. Defendant argues that many of those claims are untimely or beyond the scope of the plaintiffs' complaint, that plaintiffs have failed to set forth a *prima facie* case of discriminatory failure to promote, and that plaintiffs have failed to shoulder their burden of proving intentional discrimination. Each of defendant's contentions will be addressed in turn.

### A. The Statute of Limitations / Prescription

The instant suit was filed on December 1, 2006. Defendant argues that, under §1981, plaintiffs' failure-to-promote claims are subject to Louisiana's one-year prescriptive period rather than the federal four-year statute of limitations (doc. 66). Thus, defendant moves this Court to dismiss the failure-to-promote claims of any plaintiff that is based on a promotion that occurred prior to December 1, 2005. In opposition, plaintiffs provide an overview of the law pertaining to the prescriptive or limitations period, and then – without any substantial argument on the issue – conclude that "[u]nder the facts of this case, the promotions would have been in the natural progression of plaintiff[s'] job (continuing at an hourly rate of pay) such that it would have created a new and distinct relationship with JE Merit making the four-year prescriptive period applicable to plaintiffs' failure to promote and wrongful termination claims" (doc. 85, pp. 12-14).

18

28 U.S.C. §1658 provides, in pertinent part, that "[e]xcept as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of the action accrues." Section 1981 does not specify a limitations period for claims, and the Supreme Court has stated "[w]e conclude that a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990 – and therefore is governed by §1658's 4-year statute of limitations – if the plaintiff's claim . . . was made possible by a post-1990 enactment." *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382, 124 S.Ct. 1836, 1845, 158 L.Ed.2d 645 (2004) (quoting 28 U.S.C. §1658).

42 U.S.C. § 1981 was enacted prior to 1990, so "[c]ourts have traditionally applied the relevant state personal injury limitations period," which, in Louisiana, is one year. *Johnson v. Crown Enterprises, Inc.*, 398 F.3d 339, 341 (5th Cir. 2005). 42 The statute, however, was revised in 1991 and the revision "overturned the Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 171, 109 S.Ct. 2363, 105 L.Ed.2d 132, which held that racial harassment relating to employment conditions was not actionable under § 1981." *Jones*, 541 U.S. at 370. Thus, "claims under the 1991 revisions to § 1981 have a four-year limitations period." *Jones,* 124 S.Ct. At 1845-46.

"The 1991 revisions allow a plaintiff to sue for conduct, such as harassment or termination, that occurs after the contract formation." *Johnson*, 398 F.3d at 341.

19

Prior to the 1991 revision, a claim was actionable under §1981 only if the "nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer." *Patterson,* 491 U.S. at 185. Therefore, if a claim arises out of an opportunity for a new and distinct relationship between the plaintiffs and their employer it is grounded in legislation preceding 28 U.S.C. §1658(a) and Louisiana's one-year prescriptive period applies. If a claim is grounded in conduct occurring after the formation of a contract and does not involve an opportunity for a new and distinct relationship between the plaintiffs and employers, then the claim arises under the 1991 revision and the federal four-year statute of limitations under 28 U.S.C. § 1658(a) applies.

"In deciding whether a change of position rises to the level of a new and distinct relation, the court must compare the employee's current duties, salary, and benefits with those incident to the new position." *Police Ass'n ex rel. Cannatella v. City of New Orleans*, 100 F.3d 1159, 1170-71 (5th Cir.1996). "Where a routine promotion involves the attainment of supervisory status, that alone does not create a new and distinct employment relationship." *Fonteneaux v. Shell Oil Co.*, 289 Fed. Appx. 695, 697 (5th Cir.2008) (citing *Johnson v. Uncle Ben's*, 965 F.2d 1363, 1371 (5th Cir.1992)). "However, a non-routine promotion that involves the attainment of supervisory status may be categorized as creating a new and distinct employment relationship. *Fonteneaux*, 289 Fed. Appx. at 697 (citing *Harrison v. Associates Corp. of North America*, 917 F.2d 195, 198 (5th Cir.1990)). Moreover, "a raise in salary

20

which accompanies a change in position is evidence of a new and distinct relation, a raise which is accompanied by no significant change in duties and responsibilities does not reach the level of a change in employment relationship protected by § 1981." *Harrison*, 917 F.2d at 198.

Defendant moves to dismiss the failure to promote claims of Ventress, Rucker, Dunn, Dorsey, Gordon, Harris, Morris, Scott, and Johnson as untimely.

Ventress alleges that he was passed over for promotions that were given to Al Williamson,[16] Kenny Boutte, and Todd Landry (doc. 66-19, p.34). The uncontroverted evidence establishes that Williamson worked in the Chlorine Block as a Planner as early as 2003 (doc. 66-34, ¶ 46). He was later moved to serve as the Work Coordinator in Research and Development in 2004 (*id.*). Boutte was moved into a "leadman" position in 1994 and left the Dow site on October 3, 1996 (doc. 82, ¶27). Landry was promoted to Team Leader in 2003 (doc. 66-34, ¶ 47).

Rucker alleges in his deposition that he should have been asked if he wanted a foreman position that was ultimately assigned to Johnny Myers (doc. 66-20, p.

---

[16] Ventress actually complained that he was passed over for a promotion given to "Al Williams." Jacobs, however, states that it has no record of employing an individual named "Al Williams" (doc. 68-1; p. 17 (citing Declaration of Darrel Fuentes, ¶ 6)). It appears as though Ventress intended a reference to a Jacobs employee named "Al Williamson." The Court herein construes Ventress' claim accordingly.

21

52).[17] Myers was promoted to a Team Leader position in June of 2003 (doc. 66-36, ¶ 44).

Dunn complains that he was not promoted to a "leadman" position but that two white employees, Todd Landry and Travis Tanoos, were promoted to leadman positions between 2002 and 2004 (doc. 66-23, pp. 25-28). Todd Landry and Travis Tanoos were promoted into the foreman position in December of 2001 and January of 2002, respectively (doc. 66-34, ¶¶ 47, 49). Todd Landry was subsequently promoted to a Team Leader Position in 2003 and Tanoos was promoted to Team Leader in 2004 (id. at ¶¶ 46; doc. 66-36, ¶ 20).

Dorsey alleges that he was passed over for promotions that were given to Paul Guidry, James Howell,[18] and Larry Wheat in the Chlorine block during 2001 through 2002 (doc. 66-22, pp. 39-40). He also claims that he was denied a foreman position that ultimately went to Farrell Rose (id., at p. 42). Paul Guidry was promoted to a foreman position in December of 2001 (doc. 82, ¶ 30), James Howell was last promoted to a foreman position in June of 2002 (doc. 66-34, ¶ 59), and

---

[17] Rucker actually complained that he was passed over for a promotion given to "Johnny Miller." Jacobs, however, asserts that it has no record of employing an individual by that name (doc. 69-1). It appears as though Rucker intended reference to a Jacobs employee named "Johnny Myers," who passed the NCCER test and was rated as an A-Class Mechanic (see, doc. 82, ¶ 31). The Court herein construes Rucker's claim accordingly.

[18] Dorsey actually complained that he was passed over for a promotion given to "James Howard." Jacobs, however, asserts that it did not employ anyone by that name who worked with Dorsey (doc. 74-1, p. 11). It appears as though Dorsey intended reference to a Jacobs employee named "James Howell," who, according to defendant's records, did work with Dorsey on the Chlorine Block (see, id. (citing doc. 82, ¶¶ 33-34)). The Court herein construes Rucker's claim accordingly.

22

Larry Wheat was promoted to foreman in April of 2002 (*id.*, at ¶ 36). Farrell Rose has not worked for Jacobs since October of 2000 (doc. 82, ¶ 32).

Gordon contends that, although he never sought a specific promotion, he felt like Jacobs should have asked him if he wanted to be a Team Leader (doc. 32, pp. 32-34). He also alleges that he should have been promoted to a foreman or overseer position when Jacobs was performing turnarounds (*id.*, at p. 43). Gordon contends that he was passed over for a number of Team Leader positions that ultimately went to Rebel Blanchard, Clint Russell, Jimmy Jenkins, John Roy, Keith Matherne, and Todd Landry (*id.*, at pp. 37-42). Defendant argues that Gordon's failure to promote claims are untimely as to promotions given to Todd Landry and Clint Russell. Todd Landry took over the Team Leader position in 2003 (doc. 66-34, ¶ 47), and Clint Russell was hired as a Planner in 2001 (*id.,* at ¶ 48).

Harris alleges that he was passed over for promotions for the Team Leader position in the Vinyl 2 Block. Specifically, Harris complains that he was denied promotions that were given to Travis Tanoos, Rebel Blanchard, Robert Herring, and Preston Muse (doc. 66-28, pp. 44-45). Harris also alleges that he was passed over for a planner position that was ultimately given to Adrian Hernandez (*id.*, at p. 39). Defendant contends that Harris' failure-to-promote claim based on the promotion of Tanoos into the Team Leader position on March 9, 2004, is untimely.[19]

---

[19] The Court finds nothing in the record contrary to the statement of Kenny Hill that Tanoos was promoted to team leader on March 9, 2004 (doc. 66-36, ¶ 20).

Case 3:06-cv-00915-BAJ-SCR   Document 149   05/15/12   Page 23 of 47

The Court notes from the outset that the following claims are untimely regardless of whether they are subject to a one-year prescriptive period or the four-year statute of limitations: (1) Ventress' failure to promote claim based on the promotion of Kenny Boutte into a "leadman" position in 1994; (2) Dunn's failure to promote claims based on the promotions of Landry and Tanoos into foreman positions in December 2001 and January 2002; (3) all of Dorsey's failure to promote claims;[20] and (4) Gordon's failure to promote claim based on Clint Russell's promotion into the Planner position in 2001. Those claims shall, therefore, be dismissed.

### i. Mechanics' Failure to Promote Claims Regarding Team Leader, Planner, Scheduler, and Work Coordinator Positions

The Court next turns to plaintiffs' claims that they were passed over for Team Leader, Planner, Scheduler, and Work Coordinator positions. The plaintiffs complaining that they were not promoted to these positions – excluding Johnson – were all, at best, Class A Craft Mechanics at the time they were allegedly denied promotions.[21] Thus, in order to determine whether the one-year prescriptive period or four-year statute of limitations period applies to their claims, this Court must "compare the employee's [ ] duties, salary, and benefits [as Craft A Mechanics] with

---

[20] Specifically, Dorsey's failure to promote claims are based on Paul Guidry's promotion into a foreman position in December of 2001, James Howell's promotion into a foreman position in June of 2002, Larry Wheat's promotion into a foreman position in April of 2002, and Farrell Rose's promotion into a foreman position prior to October of 2000.

[21] At the time of the contested promotions, Johnson worked not as a craft mechanic, but as a CDL driver in the Investment Recovery Group.

those incident to the [Team Leader, Planner, Scheduler, and Work Coordinator] position[s]." See, e.g., *Cannatella*, 100 F.3d at 1170-71.

The uncontroverted evidence establishes, for purposes of the present motions, that a promotion from a Class A Craft Mechanic position to any of these positions would rise to the level of a new and distinct relationship between the plaintiffs and Jacobs. Therefore, The Court finds that the one-year prescriptive period applies. The Craft A Mechanic position is a highly hands-on position which requires the workers to perform particular tasks relating to their specified craft. Pipefitters and Boilermakers, for example, are required to read and understand drawings and piping specifications; to layout, fabricate, inspect, assemble, maintain, and repair pipe and piping system components; to have a knowledge of tools, valves, gaskets, rigging, boilers, furnaces, drums, reactors, trays, exchangers, tube repair and packed towers; and to assemble structural metal components such as supports, hangers, and spring cans (doc. 66-33, pp. 13-14, 21-22).

Team Leaders are selected by, and work under the direction of, the Area Supervisors (docs 66-4, p. 29; 66-6, p. 12, 66-11, p. 5). Team Leaders hold safety meetings, prepare worker time sheets, prepare paperwork for Dow approval, assign workers to crews, monitor the progress of unit rate jobs to ensure that the jobs will be completed within the allotted budget, make sure crews obtain proper permits, monitor lunch and break times for each crew, document disciplinary and attendance problems to discuss with Area supervisors, pick up pay checks and distribute them

25

to crew members, and provide input into decisions to terminate employees (docs. 66-4, pp. 3-4, 5-7; 66-3, pp. 20, 27; 66-10, pp. 23-24, 29-30. 46-47, 76; doc. 66-11, pp. 3-12, 18, 24; 66-16, p. 2; 66-34, ¶¶ 28-35, pp. 15-25; 66-33, ¶19, pp. 29-30). Team Leaders typically work more hours and are paid at a higher hourly rate than Class A Craft Mechanics (docs. 66-34, ¶ 29; 66-3, pp. 52-56). Work Coordinators train the Team Leaders to operate Dow's various computer programs and assign the projects and work to be performed by Jacobs in each Area or Block (docs. 66-3, ¶ 9; 66-34, ¶¶ 31-32; 66-16, p. 3; 66-8, p. 2; 66-9, p. 5; 66-10, p. 18). Work Coordinators also use the computer to update the jobs that are done by maintenance (doc. 66-16, p. 3). Team Leaders and Work Coordinators do not work in the field with their crews except in emergency situations and do not work on their tools ( docs. 66-34, ¶ 31; 66-3, p. 20).

Planners review proposed jobs and prepare packages detailing the information necessary to plan the job, including the labor, time, and material required to complete the job efficiently and safely (doc. 66-33, ¶¶ 22-27, 31). Planners are paid at a higher hourly rate than Class A Craft Mechanics (doc. 66-33, ¶ 12; 66-3, pp. 52-56). Planners must be proficient in Excel and Word, proficient with e-mail usage, be able to read and understand blueprints, have an understanding of the various craft skills necessary to complete a job, and be able to put a job plan together (doc. 66-33, ¶ 24).

The Scheduler is responsible for planning the work schedule through a job's completion (doc. 66-33, ¶27). A scheduler's work is done entirely on the computer (*id.*). Like a Planner, an employee working as a Scheduler must have strong computer skills and be able to understand the Dow systems (*id.*). Schedulers are also paid at a higher rate than Class A Craft Mechanics (doc. 99-3, pp. 52-53).

The foregoing, undisputed facts establish that the duties, responsibilities, and pay differ significantly between the position of Class A Craft Mechanic and the positions of Team Leader, Planner, Scheduler, or Work Coordinator. Thus, a promotion from Class A Mechanic to any of those positions would constitute a non-routine promotion that rises to the level of a new and distinct relationship between Jacobs and its employee, and claims arising out of the denials of such promotions are subject to a one-year prescriptive period. Therefore, the claims of any plaintiff – excluding those of Johnson[22] – that are based upon defendant's failure to promote them into Team Leader, Planner, Scheduler, or Work Coordinator positions prior to December 1, 2005, shall be dismissed.[23]

---

[22] *See, supra*, n. 21.

[23] Such claims include, but are not limited to: (1) Ventress' failure to promote claims based on the promotion of Landry into the Team Leader position in 2003 and the promotions of Al Williams into the Planner and Work Coordinator positions in 2003 and 2004; (2) Rucker's failure to promote claim based on the promotion of Johnny Myers into the Team Leader position in 2003; (3) Dunn's failure to promote claims based on the promotions of Landry and Tanoos to Team Leader positions in 2003 and 2004; (4) Gordon's failure to promote claim based on Landry's promotion into a Team Leader position in 2003; (5) Harris' failure to promote claim based on Tanoos' promotion into a Team Leader position on March 10, 2004; and (6) Morris' failure to promote claims based on any denied promotion into the Team Leader position that occurred prior to December 1, 2005.

Case 3:06-cv-00915-BAJ-SCR   Document 149   05/15/12   Page 27 of 47

### ii. Scott's Failure to Promote Claims Based on Planner, Scheduler, and MC-1 Promotions[24]

Scott complains that he was passed over for promotions into the Planner position which were awarded to Lawrence Roberts, Heath Simpson, James Howard, Terrance Mabile, Roger Lester, and Randy St. Romain. He also complains that he was passed over for a Scheduler position awarded to Connie Wheat and that he was not promoted to MC-1 (the highest classification for a material controller). Assuming without deciding that Scott satisfies his burden of establishing a prima facie case of discrimination, the Court notes that defendant has set forth evidence to support its assertions that Scott was not promoted to the positions because he lacked training and experience in craft skills (doc. 66-3, pp. 93-95) and because he neglected safety regulations (doc. 66-12, pp. 47- 51). In opposition to the motion, Scott has failed to set forth evidence to controvert the reasons given or to suggest that the denials were discriminatory. Accordingly, his claims of discriminatory denial of promotions shall be dismissed.

### iii. Johnson's Failure to Promote Claims Based on Planner and Team Leader Promotions

Johnson complains that he was not considered for Planner positions that were offered to John Becker, Larry Wheat, an unidentified white employee, and a white

---

[24] Although defendant noted that it was unclear whether Scott sought to recover for every denied promotion into the Planner position that occurred between 2003 (the time he first expressed an interest) and December 1, 2005, the Court finds that Scott asserts no such claim.

employee by the name of "Brother James." Johnson also alleges that he was not considered for the Team Leader position that was offered to Paul Lewis in the Shipping and Receiving Group in 2003 or 2004. The uncontroverted evidence establishes for purposes of the motion that John Becker was promoted into the Planner position on approximately April 21, 2003 (doc. 66-34, ¶ 63). Larry Wheat was promoted into the Planner position on or about January 3, 2005 (doc. 66-34, ¶56). Defendant contends that the claims based on Lewis, Becker, and Wheat's promotions are subject to Louisiana's one-year prescriptive period and, therefore, untimely.

Johnson was working as a CDL driver in the Investment Recovery Group when he was allegedly denied a promotion into the Shipping and Receiving Group as a Team Leader (doc. 66-31, pp. 6, 29).[25] Thus, in order to determine whether the one-year prescriptive period applies to this failure to promote claim, the Court must "compare [Johnson's] duties, salary, and benefits [as a CDL driver in the Investment Recovery Group ] with those incident to the [Shipping and Receiving Group Team Leader] position." See, e.g., *Cannatella*, 100 F.3d at 1170-71).

The uncontroverted evidence establishes for purposes of the motions that the job duties performed by a CDL driver in the Investment Recovery Group are wholly unrelated to the duties performed by a Team Leader in the Shipping and Receiving

---

[25] Johnson states that he began work as a CDL driver in April of 2001 (doc. 66-31, p. 6) and continued in that position until approximately six months prior to his June 24, 2008 deposition (*id.* at p. 29).

Group and that Team Leaders are typically paid at a higher rate than a CDL Driver (docs. 66-33, p. 32, Ex. 31-E; 66-31, p. 23). In the Investment Recovery Group, Johnson was responsible for removing, collecting, and inventorying old material – mainly valves – at each job site (doc. 66-31, pp. 24-25). He would decontaminate the materials and send them to an outside company that would resell the materials to other contractors as salvage (*id.*). In the Shipping and Receiving Group, however, workers are typically called upon to receive inventory into the plant and prepare material for shipping out of the plant or within the plant (*id.* at 20-21). Moreover, as is noted *supra*, the duties and responsibilities of a Team Leader are predominately managerial and administrative in nature. Johnson testified that his job as a CDL driver consisted primarily of working in the field with a pipefitter to collect salvageable material (*id.* at 25-26). Considering the disparity of the duties and responsibilities of each position as well as the disparity in pay, the Court concludes that Johnson's promotion from a CDL driver position in the Investment Recovery Group to a Team Leader position in the Shipping and Receiving Group would rise to the level of a new and distinct relationship between Johnson and his employer. Therefore, a one-year prescriptive period applies, and that claim shall be dismissed.

Next, the Court must consider whether Johnson's promotion into a Planner position would rise to the level of a new and distinct relationship. Johnson complains that he was denied promotions into the Planner position in 2003 and 2005, while he

was working as a CDL driver in the Investment Recovery Group.[26] Johnson's job duties as a CDL driver, however, were significantly different than the job duties of a Planner. As a CDL driver, Johnson was responsible for removing, collecting, and inventorying old material – mainly valves – at each job site (doc. 66-31, pp. 24-25). Planners, on the other hand, review jobs and detail how the jobs will be accomplished, which involves estimating the time and material necessary to complete the jobs. Specifically, Planners are required to prepare a package that contains all of the necessary information about a job, including the labor and material required to complete the job efficiently and safely (doc. 66-33, pp. 6-7, 31, Ex. 31-D). Moreover, Planners earn the same rate of pay as a Team Leader – a higher rate of pay than CDL drivers typically receive.[27] The uncontradicted evidence demonstrates that a promotion from a CDL driver position to the Planner position would rise to the level of a new and distinct relationship between Johnson and Jacobs. Therefore, Louisiana's one-year prescriptive period applies, and Johnson's claims arising out of promotions into the Planner position that were denied prior to December 1, 2005 shall be dismissed.

---

[26] Defendant attempts to compare Johnson's job duties in Shipping and Receiving with those of a Planner. However, Johnson was not promoted to Back-Up Team Leader in the Shipping and Receiving Group until January, 2008, and the promotions were allegedly denied in 2003 and 2005. See (doc. 66-31, p. 29). Therefore, the Court compares the CDL driver and Planner positions to determine whether a new and distinct relationship was formed.

[27] Record Document No. 66-34, Declaration of Kenny Clark, p. 8, ¶ 36; Record Document No. 66-33, Declaration of Jeff Cooley, p.32, Exhibit 31-E; Record Document No. 66-31, Deposition of Adam Johnson, p. 23.

31

## B. Claims Beyond the Scope of Plaintiffs' Complaint

Defendant contends that several of the failure to promote claims of plaintiffs, Harris, Morris, and Scott, fall beyond the scope of their complaint. Defendant correctly argues that a failure to promote claim arises from a discrete action, and is not subject to a continuing violation theory. See, e.g., *Cooper v. Williamson County Board of Education*, 587 F. Supp. 1082, 1094 (M.D. Tenn. 1983) (finding that a court may not act on a claim that arose after the complaint was filed and which never became a part of the action through an amended complaint); *Davis v. Harris*, No. 03-3007, 2006 WL 3321630, at *2 (C.D.III. Nov.14, 2006)("In order to pursue claims based on events that occurred after the filing of a complaint, a plaintiff must, with leave of Court, file supplemental pleadings that set forth the new claims. Fed.R.Civ.P. 15(d). Such supplemental pleadings give the defendant fair notice of the additional claims."); *Mauro v. Southern New England Telecom., Inc.*, 208 F.3d 384, 386 n. 1 (2d Cir.2000) (affirming the district court's refusal to consider claims relating to position openings that arose after the filing of the complaint where plaintiff never sought to amend pleadings). Thus, promotions denied after the filing of a complaint generally do not fall within the scope of the litigation.

The original complaint was filed on December 1, 2006. Plaintiffs, however, filed an amended complaint on January 1, 2007, reasserting failure to promote claims. Applying the court's reasoning in *Cooper, supra*, the Court concludes that

the claims arising after the filing of the amended complaint are beyond the scope of this litigation.[28]

## C. Remaining Failure to Promote Claims

Defendant also seeks to dismiss the following failure to promote claims:

(1) Gordon's claim that he was passed over for Team Leader positions given to Rebel Blanchard, Jimmy Jenkins, John Roy, and Keith Matherne;

(2) Harris' claim that he was passed over for a Team Leader position given to Rebel Blanchard, a Planner position given to Travis Tanoos, and a Scheduler position given to Andre Jones;[29]

(3) Morris' claim that he was denied promotions into the Planner position;

(4) Johnson's claim that he was passed over for Planner positions given to an unidentified white employee and "Brother James;"

(5) Allen Edwards' claim that he was never considered for a foreman position on a turnaround;

---

[28] Such claims include, but are not limited to: (1) Morris' failure to promote claims based on Randy Pierce and Brad Jenkins' promotions into Team Leader positions on October 2007 and August 2007, respectively; (2) Morris' failure to promote claims based on his denied opportunity to serve on the "Beyond Zero" safety committee after May 2008; (3) Scott's failure to promote claims based on the promotions of Lawrence Roberts, Heath Simpson, James Howell, Terrance Mabile, Roger Lester, Randy St. Romaine, and Connie Wheat into Planner and Scheduler positions in "late 2007" and 2008; (4) Harris' failure to promote claims based on the promotions of Adrian Hernandez and Charles Williams into the Planner positions in February 2007 and September 2008, respectively; and (5) Harris' failure to promote claim based on the promotion of Ron Fleming into the Scheduler position on or about December 2007.

Upon its review of the record, the Court cannot discern whether the following claims are within the scope of this litigation: (1) Harris' claims based on the promotions of Robert Herring and Preston Muse; (2) Morris' claim based on the promotion of Jeff Dinino; and (3) Scott's claim based on a denied promotion into the MC-1 classification. Because plaintiffs bear the burden of setting forth such evidence, the Court will not consider these claims.

[29] Harris also claims that he was passed over for a Planner position given to Lawrence Roberts. Jacobs' records show that Lawrence Roberts was not a planner but rather a paint inspector. Harris offers no evidence to dispute this fact. Because Harris makes no argument regarding a promotion into a paint inspector position, the Court considers the claim waived.

33

(6) Gerald Taylor's claim that he was never considered for a supervisor position over contractors working in the LHC-3 Block and that he was denied a promotion into a supervisory position over a decontamination job given instead to Davis Sonnier.

Specifically, defendant argues that plaintiffs have failed to set forth a *prima facie* case and have failed to meet their burden of proving intentional discrimination on these claims.

"To establish a *prima facie* case for a failure to promote claim, a plaintiff must establish that: (1) she is a member of the protected class; (2) she applied for a position for which she was qualified; (3) she was rejected for the position; and (4) after she was rejected, the employer continued to seek applicants with the employee's qualifications or filled the position with someone outside the protected class." *Browning v. Southwest Research Inst.*, 288 Fed. Appx. 170, 175 (5th Cir.2008)(citing *Celestine v. Petroleos de Venezuella*, S.A., 266 F.3d 343, 354-55 (5th Cir.2001)). A plaintiff must establish that she meets objective promotion criteria at the *prima facie* stage of her case. *Id.* at 175-176 (citing *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir.2001)).

The Court finds that Morris, Johnson, and Edwards have failed to establish the forth prong of their *prima facie* case. In order to satisfy this prong, the plaintiffs must set forth evidence to create a genuine dispute of fact as to whether Jacobs continued to seek applicants with their qualifications or filled the position with someone outside their protected class. See *Browning*, 288 Fed. Appx. at 175. Plaintiffs' opposition to summary judgment does not mention whether Jacobs

34

continued to seek applicants for the jobs allegedly denied to Morris, Johnson, or Edwards. Moreover, generalized allegations that Morris was denied promotions into the Planner position and Edwards was never considered for a foreman position on a turnaround do not satisfy the standard requiring them to set forth specific facts showing that Jacobs "filled the position with *someone outside [their] protected class[es]*." *Id.* Although Johnson sets forth more particularized allegations – that he was denied promotions given to an unidentified white employee and "Brother James" – the record is bare of any evidence that either "Brother James" or any white employee actually filled a planner position which Johnson sought.[30] Plaintiffs bear the burden of going "beyond the pleadings and designat[ing] specific facts showing that there is a genuine issue of material fact for trial." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir.2001) (internal citation omitted). Morris, Johnson, and Edwards have failed to meet that burden. Accordingly, their failure to promote claims shall be dismissed.

Harris' claim that he was passed over for a promotion given to Andre Jones and Taylor's claim that he was passed over for a supervisory position in the furnace area of the LCH-3 Block in 2006 must also fail, as they have not met the forth prong of their *prima facie* case. Andre Jones is a black male and, thus, within Harris' protected class (doc. 66-36, p. 9). Taylor's deposition also indicates that the

---

[30] No record of an employee by the name of "Brother James" has been set forth. Nor has any evidence been set forth to establish that any employee of Jacobs used the alias "Brother James" or to identify the white employee that Johnson referenced in his deposition. Plaintiff's opposition makes no attempt to identify these individuals.

supervisory position in the furnace area of the LCH-3 Block was given to another black male (doc. 66-25, pp. 37-40). Because Harris and Taylor have failed to prove that Jacobs continued to seek applicants with their qualifications or filled the position with someone outside their protected class, their claims must be dismissed.

The Court next turns to the failure to promote claims asserted by Gordon, Harris, and Taylor, who fail to establish that they meet the objective promotion criteria of the positions they sought.

Jacobs alleges that Gordon was not promoted to the Team Leader position because he was required to pass the NCCER examination and failed to do so. Gordon, along with several other plaintiffs who failed the NCCER exam, complain that the NCCER requirement is a "sham." In support of this contention, plaintiffs allege that (1) there is no NCCER requirement listed in the team leader job description; (2) Kenny Clark, Assistant Site Manager, "admits that you do not have to pass the NCCER to be a team leader nor has he ever seen a document evidencing the NCCER requirement for the team leader position;" (3) Scott Davis and Debbie Mancuso, two area supervisors, have never taken the NCCER exam; (4) Clint Russell, "a white male who became a team leader in 2005, admits that he never took the NCCER test prior to becoming a team leader;" and (5) welders were not required to take the NCCER exam prior to becoming supervisors.

Plaintiffs do not dispute, and the undisputed evidence establishes for purposes of the motions, that Jacobs requires workers to attain a Class A rank or

36

better in order to be eligible for the Team Leader position (docs. 66-3, pp. 60-62; 66-4, pp. 111-141, 148-149; 66-10, pp. 30-32; 66-33, p. 6; 66-34, p. 7). Because plaintiffs were unable to pass the NCCER exam, they were demoted to Class B Mechanics. Thus, once again, plaintiffs' claims hinge on the propriety of Jacob's decision to implement the NCCER examination as a requirement of the Class A Mechanic position. As previously noted, plaintiffs have failed to prove that the NCCER requirement is false, "unworthy of credence," or otherwise unpersuasive, or that race was a motivating factor in Jacobs' decision to demote them to Class B mechanics. Because no evidence has been set forth to show that their demotions were products of racial discrimination, and because they no longer met the objective criteria for promotion to Team Leader, the claims of all Class B Mechanics complaining of denied promotions into the Team Leader position shall be dismissed.

Harris claims that he was denied promotions into the Team Leader and Planner positions. Defendant argues that Harris was not promoted to the Team Leader position because Harris had difficulty delegating work, and defendant cites the independent observations of three of Harris's former supervisors to establish that Harris had difficulty delegating work – a major responsibility of the Team Leader (docs. 66-6; p. 98; 66-10, pp. 18-20, 24, 49, 76; 66-11, pp. 26, 46-53). Defendant also contends that Harris lacked the basic computer skills required for the Planner position. Harris does not dispute that an ability to delegate work was a requirement for the Team Leader position, and he admits that a working knowledge of Excel is

37

required for the Planner position, but Harris offers no relevant evidence to refute the evidence offered by Jacobs regarding his inability to delegate work, and he admits that does not know how to use an Excel spreadsheet (doc. 66-28, pp. 63-65).[31] Thus, Harris has failed to establish that he met the objective promotion criteria to be promoted into the Team Leader and Planner positions. Accordingly, Harris' failure to promote claim shall be dismissed.

## III. Transfer and Termination Claims

Cosey alleges that he was transferred from the Glycol 2 Block to the Poly B Block and subsequently laid off on the basis of his race. Defendant contends that Cosey was transferred to Poly B to replace an injured worker who had taken a medical leave of absence and, when the worker returned, there were no available positions for Cosey. Cosey does not dispute defendant's reason for the transfer. Instead, Cosey argues that two lesser-experienced white employees in the Glycol 2 Block should have been sent to "fill in" for the injured employee.

---

[31] In describing the Planner job, Charles Williams stated that "it's totally computer work" (doc. 66-11, p. 39). The job description for Planner indicates that the Planner is responsible for creating job packages from the work order scope. Some of the job duties of a Planner include: (1) Reviewing work orders for technical completeness in the GEMTS system; (2) accessing archived work plans to create updated plans via computer on the GEMTS system; (3) preparing job packages and inputting plans into the GEMTS computer system indicating the required resources, materials, and labor services; (4) confirming material availability and store job plan into active backlog via computer on the MSMS system; (5) identifying task activities necessary to execute job; (6) identifying materials/tools/equipment necessary to perform tasks; Identifying/soliciting safety information and requirements necessary to safely perform tasks; (7) recording task/information within the work order on the GEMTS computer system; (8) gathering input from other crafts to incorporate into job plan; (9) archiving repetitive job plans on the GEMTS computer system; and (10) using the most effective technology for job duties. (Doc. 66-33, p. 6, Ex. D).

The Court will assume *arguendo* that Cosey has established a *prima facie* case of discrimination. Therefore, the issue becomes whether Cosey has established that Jacobs' proffered reasons for transferring and terminating him were pretext for racial discrimination or whether Cosey's race was a motivating factor in Jacobs' decision to transfer and terminate him.

The undisputed evidence indicates that Cosey primarily worked turnarounds for Jacobs from 1980 through 2003 (doc. 66-21, p. 13). During that period, Cosey was laid off by Jacobs twenty-four times (*id.* at 21). In September of 2003, Cosey was re-hired by Jacobs as a pipefitter and assigned to work in the Glycol 2 Block (*id.*). In April of 2004, Cosey was transferred to Poly B to replace an injured worker who had taken a medical leave of absence (*id.* at 22-23). Cosey was told, and he understood, that his assignment to the Poly B block was temporary in nature (*id.* at 22, 25; doc. 66-41, pp. 111-112). When the other employee returned to Poly B, there were no available positions for Cosey and he was laid off (doc. 66-41, p. 112).

Cosey offers no evidence to suggest that Jacobs' proffered reasons were pretextual. Moreover, Cosey offers no evidence to establish that there were available positions to which he could have been transferred on May 27, 2004. To the contrary, the uncontroverted evidence indicates that Jacobs was downsizing at the time of Cosey's termination, and, from May 21, 2004, through May 28, 2004, Jacobs laid off seventeen workers (doc. 82, p. 5). Of those seventeen workers, six were black and eleven were white (*id.*).

39

Because no rational factfinder could conclude from the evidence that Jacobs'
nondiscriminatory reasons were pretextual or that Cosey's race was a motivating
factor in Jacobs' decision to transfer and terminate him, summary judgment is
appropriate. Accordingly, Cosey's termination and transfer claims shall be
dismissed.

## IV. Denial of Overtime Claims

Johnson contends that he was denied the opportunity to work overtime
because of his race. Prior to 2004, while working in Investment Recovery, Johnson
worked approximately sixty to eighty hours each week (doc. 66-31, p. 64). In 2006,
Dow informed Jacobs that any block that worked under a "home account" – a non-
rechargeable, fixed budget account – could not allow its employees to work overtime
unless the overtime was approved in advance by Dow (docs. 66-3, p. 18; 66-33, p.
7; 66-34, pp. 8-9). Investment Recovery, where Johnson worked, is considered a
home account (docs. 66-33, p. 8; 66-34, p. 10). As a result, Johnson could only
work overtime if it was specifically approved in advance. Johnson asserts that Dawn
Thibodeaux and Brian Breaux, two white employees, were allowed to work overtime
and were thus allowed to "circumvent the alleged policy that no home account
employees could work overtime in other blocks" (doc. 85, p. 10).

Defendant argues that Breaux was not working on a home account; that
Thibodeaux's overtime work was approved by the Dow Work Coordinators; and that
Thibodeaux was later moved out of the home account system. Defendant also

40

asserts that Johnson's co-plaintiff, Ornise Scott, an Inventory Management employee, received approval to work overtime on a regular basis.

As part of his *prima facie* case, Johnson must "demonstrate that a 'similarly situated' employee under 'nearly identical' circumstances, was treated differently." *Wheeler*, 415 F.3d at 405 (citations omitted). This standard is strictly construed. *Okoye*, 245 F.3d at 514-15. The Fifth Circuit has consistently found that employees with different responsibilities, different supervisors, different capabilities, different work rule violations, or different disciplinary records are not considered "nearly identical." See, e.g., *Lee*, 574 F.3d at 259-260.

Defendant has presented competent, uncontroverted summary judgment evidence to establish that Dow's overtime policy required advance approval of any employee seeking to work overtime in a block under a home account (docs. 66-3, p. 18; 66-33, p. 7; 66-34, pp. 8-9); that Thibodeaux received approval to work overtime (docs. 66-33, p. 8; 66-12, pp. 34-37; 66-13, pp. 12-13); and that Breaux was not working on a home account (docs 66-33, p. 9; 66-12, pp. 54-57; 66-13, pp. 13-17; 66-3, pp. 36-38). Johnson offers no evidence to the contrary but simply alleges that there was no document outlining or establishing the parameters of the overtime policy and that Gaylon Landry had a "difficult time attempting to explain the policy in his deposition" (doc. 85, p. 10).[32] The evidence is insufficient to create a genuine dispute of fact as to whether Dow had no such overtime policy or whether

---

[32]Plaintiff does not explain, and the Court fails to see, how Gaylon Landry's knowledge of the issue is relevant.

41

Johnson was similarly situated to either Breaux of Thibodeaux. See, e.g., *Kretchmer v. Eveden, Inc.*, 374 F. App'x 493, 496 (5th Cir.2010). Because Johnson has failed to identify any similarly situated employee outside of his race who was allowed to work overtime on a work order not approved by Dow, Johnson's denial of overtime claim must be dismissed.

## V. Retaliation Claims

Hollins, Dorsey, and Scott allege that defendant retaliated against them for engaging in protected activity. Though Scott asserts a claim of retaliation, he has failed to identify or to set forth evidence of any protected activity in which such a claim is grounded. Accordingly, the claim shall not be addressed further and shall be dismissed.

Dorsey asserts that he was terminated ten days after filing his April 4, 2003, EEOC charge alleging race discrimination. Hollins asserts that she intermittently worked turnarounds for Jacobs during a nine-year period, was laid off on June 13, 2005, filed the instant lawsuit on December 1, 2006, and that Jacobs refused to hire her in 2008.[33]

---

[33] Hollins made a vague reference in her amended complaint to a claim of retaliation. Specifically, in Paragraph 17 of the Amended Complaint, plaintiffs state that their "claims arise from a pattern and practice by defendant of... retaliation for opposing unlawful practices." Based upon this paragraph and on Hollins' testimony that Jacobs refused to hire her in 2008, (pg. 46 Hollins' deposition) defendant moved for Summary Judgment on Hollins' retaliation claim. Although Hollins has never properly amended her complaint to include this retaliation claim, she briefed the issue in her Memorandum in Opposition to Defendant's Motion for Summary Judgment. In the interests of justice, the Court construes the allegations set forth in her opposition brief as a motion to amend her pleadings out of time. The Court also grants the motion and addresses the claim herein. See *Morin v. Moore*, 309 F.3d 316, 323 (5th

(continued...)

Case 3:06-cv-00915-BAJ-SCR   Document 149   05/15/12   Page 42 of 47

A plaintiff establishes a *prima facie* case for unlawful retaliation under § 1981 by proving: (1) that she engaged in activity protected by Title VII or § 1981, (2) that an adverse employment action occurred, and (3) that a causal connection exists between the protected activity and the adverse employment action. *Lemaire v. State of Louisiana*, 480 F.3d 383 (5th Cir. 2007); *Foley v. Univ. of Houston System*, 355 F.3d 333, 339-340 (5th Cir. 2003). Defendant concedes that Hollins and Dorsey have established the first and second prongs of their *prima facie* case. However, defendant argues that Hollins and Dorsey have not proven causation and have failed to meet their ultimate burden of establishing retaliation.

The causal link required by the third prong of the *prima facie* case does not have to meet a "but for" standard. A plaintiff does not have to prove that his protected activity was the sole factor motivating the employer's challenged actions in order to establish the causal link element of a *prima facie* case. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002). Close timing between an employee's protected activity and an adverse action against the employee may provide the causal connection needed to make out a *prima facie* case of retaliation. "Absent an

---

[33](...continued)
Cir.2002)(holding that "in the interest of justice a revised theory of the case set forth in the plaintiff's opposition should be construed as a motion to amend the pleadings filed out of time and granted by the district court pursuant to the permissive command of Rule 15."); *Sherman v. Hallbauer*, 455 F .2d 1236, 1242 (5th Cir.1972) (holding that, where the plaintiffs - in their memorandum in opposition to summary judgment - switched the legal theory on which they based their case, the district court should have construed the memorandum as a motion to amend the pleadings); see also *Burchett v. Bromps*, 380 Fed.Appx. 568, 569-570 (9th Cir. 2010) (citing *Apache Survival Coal. v. United States*, 21 F.3d 895, 910 (9th Cir.1994); *Johnson v. Mateer*, 625 F.2d 240, 242 (9th Cir.1980)).

43

inference of causation due to temporal proximity, [the Fifth Circuit] has 'determined that, in order to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity.'" *Cox v. Desoto Cnty., Miss.*, 407 Fed. Appx. 848, 851 (5th Cir. 2011) (citing *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir.2003)). "It is well established that, 'in determining whether an adverse employment action was taken as a result of retaliation, [the] focus is on the final decisionmaker.'" *Cox,* 407 Fed. Appx. at 852 (citing *Ackel v. Nat'l Commc'n, Inc.*, 339 F.3d 376, 385 (5th Cir.2003)). Although the focus is on the ultimate decisionmaker, a plaintiff can make out a *prima facie* case by showing that other employees, with discriminatory motives, "had influence or leverage over the official decisionmaker." *Dumas v. Union Pacific R.R. Co.*, 294 Fed. Appx. 822, 826 (5th Cir.2008) (quoting *Gee*, 289 F.3d at 346). See also *Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir.1996) (noting that if the final decisionmaker serves as the "cat's paw" of those acting with retaliatory motives, the causal link remains intact).

If the plaintiff makes a *prima facie* showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir.2007) (citations omitted). The employer's burden is only one of production, not persuasion, and involves no credibility assessment. *Id.* If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the

44

employer's proffered reason is not true but instead is a pretext for the real retaliatory purpose. *Id.* at 557 (internal citations omitted). To carry this burden, the plaintiff must rebut each ... nonretaliatory reason articulated by the employer." *Id.* at 556.

Defendant argues that Hollins has failed to demonstrate that Jacobs knew about the protected activity and that she, therefore, has failed to establish the third prong of her *prima facie* case. The record demonstrates that Hollins filed the instant lawsuit on December 1, 2006, and she contends that Jacobs retaliated against her by refusing to hire her in 2008. Hollins, however, is not entitled to an inference of causation due to temporal proximity where over thirteen months separate the protected activity and the alleged act of retaliation. See, *Cox*, 407 Fed.Appx. at 851 (stating that, "[t]hough we have previously held that '[c]lose timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation' the lengthy period of time between [the plaintiff's] filing of the lawsuit and her termination –thirteen months– is insufficient to support an inference of causation").

Because Hollins cannot rely on temporal proximity to create an inference of causation, she must "demonstrate that the employer knew about the employee's protected activity." *Id.* Hollins has offered no evidence that anyone conducting the hiring at Jacobs had any knowledge of Hollins' lawsuit. Therefore, her retaliation claims shall be dismissed.

45

Regarding Dorsey's retaliation claim, the defendant argues that it has articulated a non-retaliatory reason for its employment action and that Dorsey has failed to rebut that reason. Specifically, defendant contends that Dorsey's employment was terminated on April 14, 2003, after Malcolm Smith, Dorsey's Exxon Supervisor, observed Dorsey exiting a scaffold without using his fall protection equipment. Defendant has provided competent summary judgment evidence to support this contention (doc. 82, pp. 6-7 & Exs. O, P, Q, R). The undisputed evidence reflects that Dorsey's employment was terminated for his failure to use fall protection equipment while on a scaffold, which is a violation of Jacobs' "100% Fall Protection Policy" and is a proper ground for immediate termination (*id.*). Moreover, Dorsey admits that he committed the infraction and that he was terminated as soon as Smith witnessed it (doc. 66-22, p. 89). Accordingly the Court concludes that defendant, Dorsey, has failed to set forth evidence to create a genuine issue of fact as to an essential element of his claim of retaliation and his claim is, therefore, dismissed.

## CONCLUSION

For all of the foregoing reasons:

The motions by defendant, J.E. Merit Constructors, Inc, for summary judgment (docs. 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81) are **DENIED** only insofar as defendant seeks to preclude the Court's consideration of the failure

46

to promote claims of any plaintiff that arose from Jacobs' failure to promote after December 1, 2006, and are **GRANTED** in all other respects.

Accordingly, this matter shall be dismissed with prejudice. Judgment shall issue separately.

Baton Rouge, Louisiana, May _15_, 2012.

BRIAN A JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

Case 3:06-cv-00915-BAJ-SCR   Document 149   05/15/12   Page 47 of 47